IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

Timothy Nichols

    Plaintiff,

v.

AT&T Inc. and AT&T Mobility, LLC,

    Defendants.

## COMPLAINT AND JURY DEMAND

Plaintiff Timothy Nichols complains against AT&T Inc. and AT&T Mobility, LLC (collectively, "AT&T" or "Defendants") as follows:

### INTRODUCTION

Plaintiff seeks redress for Defendants' failure to protect his financial information during a "SIM Swap" attack that Defendants facilitated in the fall of 2022. In a nutshell, Defendants intentionally, wantonly, or negligently, aided hackers in stealing over $303,000 worth of cryptocurrency from Plaintiff's cryptocurrency account by helping hackers clone Plaintiff's mobile phone at least three times over several months. Defendants are liable for the resulting damages because they knew about the scam and repeatedly breached their duty to protect customers like Plaintiff despite reassuring customers that they would guard against SIM Swapping, as shown in repeated lawsuits arising from almost identical fact patterns. *See e.g., Williams v. AT&T Mobility, LLC*, 2020 U.S. Dist. LEXIS 52899, 2020 WL 1492803 (E.D. N.C. Mar. 25, 2020) (denying motion to dismiss multiple causes of action, including for violation of the Federal Communications

Act, negligence, and negligent supervision in factually analogous case); *Ross v. AT&T Mobility, LLC*, 2020 U.S. Dist. LEXIS 166298, 2020 WL 9848766 (N.D. Cal. May 14, 2020) (same); *Edwards v. AT&T, Inc. et al*, Case No. 2:21-cv-00342-DBP (Utah D. June 3, 2021) (alleging similar claims in analogous fact pattern). Despite this history, Defendants ignored repeated pleas to resolve this matter promptly, forcing Plaintiff to seek this Court's aid in rectifying Defendants' transgressions.

## PARTIES

1. Plaintiff Timothy Nichols is a citizen of the United States of America who is domiciled in Larimer County, Colorado.

2. Defendant AT&T Mobility, LLC is a Delaware limited liability corporation with its principal office and place of business in Brookhaven, Georgia.

3. AT&T is a "common carrier" governed by the Federal Communications Act ("FCA"), 47 U.S.C. § 151 *et seq.*

4. The Federal Communications Commission ("FCC") regulates AT&T's acts and practices, including those occurring in this district.

5. AT&T transacts or has transacted business in this district and throughout the United States.

6. On information and belief, AT&T Inc. owns a 100% interest in AT&T Mobility. AT&T Inc. is also incorporated in Delaware and has its principal place of business in Brookhaven, Georgia.

**JURISDICTION AND VENUE**

7. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this case arises under the FCA. The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the state law claims because they arise from a common nucleus of operative facts.

8. This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) because this action is between citizens of different states, there is complete diversity between the parties, and the amount in controversy exceeds $75,000.00.

9. This Court has personal jurisdiction over the Defendants because they transacted business and committed tortious acts in this district.

10. Venue is proper in this judicial district under 28 U.S.C. § 1391 because the events and circumstances giving rise to the claims asserted here occurred in this judicial district.

**FACTUAL ALLEGATIONS**

**A.    AT&T Attracts SIM Swaps in 2022**

11. As of November 2022, AT&T "operate[d] worldwide in the telecommunications and technology industries."[1] It then serviced more than 210 million individual mobile subscribers, and correspondingly, had access to personal and sensitive data belonging to hundreds of millions of individuals like Plaintiff.

12. AT&T recognizes its duty to secure the subscribers' personal and sensitive information. For example, AT&T's privacy policy, which is incorporated into its Consumer Services Agreement, opens with an unequivocal pledge:

---

[1] *See* AT&T's Form 10-Q at 9 (Nov. 3, 2022), https://otp.tools.investis.com/clients/us/atnt2/sec/sec-show.aspx?Type=html&FilingId=16174763&CIK=0000732717&Index=10000 (last visited March 2, 2024).

3

> You can count on us to provide you with products and services designed with privacy in mind, while also giving you control over how your information is shared.

*See* AT&T Privacy Portal at https://about.att.com/privacy.html (last visited March 2, 2024).

13. Despite its pledges, AT&T repeatedly failed to protect consumers' data from well-known risks and actively aided bad actors to steal consumers' SIM cards and data.

14. A SIM card – or "subscriber identity module" card – is a small, removable chip that allows a cellular telephone to communicate with the wireless carrier and to know which subscriber is associated with the particular telephone.

15. The SIM card associated with a wireless telephone can be changed, allowing customers to move their wireless number from one cellular telephone to another and to continue accessing the carrier network when they switch telephones.

16. To switch a SIM card, however, "[t]he wireless carrier must effectuate the SIM card assignment."[2]

17. A "SIM Swap" refers to an unauthorized and illegitimate SIM card change. It is a hacking technique whereby a hacker induces the carrier to change the telephone associated with the SIM card, rerouting the victim's telephone activity (*e.g.*, phone calls, text messages) to a third-party telephone. The victims lose their telephone connection while the hackers receive all the text messages and telephone calls intended for the victims. Once the hackers establish control over the victims' telephone number(s), the hackers can access the victims' online accounts, which often utilize telephone based, two-factor authentication for access and requests to change passwords.[3]

---

[2] *Williams*, 2020 U.S. Dist. LEXIS 52899, at *2.
[3] *See id.*

18. As of the fall of 2022, AT&T had actual knowledge of the risks of SIM Swapping and purported to have adopted policies to guard against SIM Swapping.

19. For example, on February 8, 2022, the FBI of warned common carriers like AT&T that they had become targets of SIM Swap scams whereby hackers were causing millions of dollars in damages by cloning subscribers' SIM cards.[4]

20. As relevant here, the FBI warned "mobile carriers and the public of the increasing use of [SIM] swapping by criminals to steal money from fiat and virtual currency accounts."[5] Concurrently, "[t]he FBI recommend[ed] mobile carriers to the following precautions":

- <u>Educate employees and conduct training sessions on SIM swapping</u>.
- Carefully inspect incoming email addresses containing official correspondence for slight changes that can make fraudulent addresses appear legitimate an resemble actual clients' names.
- Set strict security protocols enabling employees to effectively verify customer credentials <u>before changing their numbers to a new device</u>.
- Authenticate calls from third party authorized retailers requesting customer information.

*See id.* (emphasis added).

21. Despite representing to customers and regulators that it had adopted these and purportedly even stronger security measures, AT&T granted hackers access to Plaintiff's SIM card in the fall of 2022.

**B.     AT&T Facilitates a Swap of Plaintiff's SIM Card**

22. Plaintiff has been a wireless telephone subscriber of AT&T since 2005.

---

[4] *See* Criminals Increasing SIM Swap Schemes to Steal Millions of Dollars from US Public, Federal Bureau of Investigation's Public Service Announcement at https://www.ic3.gov/Media/Y2022/PSA220208 (last visited March 2, 2024).
[5] *See id.*

5

23. On September 20, 2022, Plaintiff traded his Samsung Galaxy S10 mobile telephone for a Samsung Galaxy Z Flip 4 mobile telephone at AT&T's Store No. SM48 (the "Store"), located at 4515 John F. Kennedy Parkway, Suite 4A, Fort Collins, Colorado.

24. Upon exiting the Store, Plaintiff attempted to call his spouse multiple times using the new telephone, but the calls would not go through.

25. Plaintiff returned to the Store, where a different AT&T agent took the new telephone to a back room, returned making a statement to Plaintiff to the effect of there being an error with the telephone's "SIM card," and proclaimed that the telephone had been fixed.

26. Over the ensuing eight weeks, Plaintiff used his new phone without significant incident and timely paid AT&T for the corresponding services.

27. At approximately 9:00 a.m. (MST) on November 9, 2022, Plaintiff used the new telephone to access his account on a cryptocurrency trading platform. This was the first time Plaintiff used the new telephone or any other device to access the account since he activated the new telephone on September 20. Plaintiff proceeded to request a transfer of about $10,000 from the cryptocurrency account to his account at a retail bank.

28. On November 16, 2022, Plaintiff learned that the $10,000 transaction was unsuccessful when he checked his checking account at the retail bank, prompting him to access his cryptocurrency account to review the status of the transfer.

29. Plaintiff was unable to access his cryptocurrency account because someone unknown to him and without his knowledge or consent had changed his username and password.

30. When Plaintiff was finally able to access the digital wallet with help from the cryptocurrency exchange staff, Plaintiff learned that on November 11, 2022, an unauthorized third

party accessed his account and without Plaintiff's knowledge or consent transferred 76.46 Ethereum and .16858739 Bitcoins (collectively worth approximately $303,000) from his cryptocurrency account to an unknown third-party digital wallet.

31. Over the ensuing weeks, Plaintiff spent considerable time and resources trying to restore his account and retrieve the stolen cryptocurrency.

32. Although Plaintiff was not able to recover the stolen cryptocurrency, he and other consultants were able to determine that hackers gained access to his account by swapping his SIM card with AT&T's help.

33. Specifically, Plaintiff returned to the Store where an AT&T agent showed him a database revealing that that at 4:30 p.m. (MST) on November 9, 2022 – fewer than eight hours after Plaintiff used his new telephone to access the digital wallet for the first time – the digital SIM card that AT&T assigned to Plaintiff's new telephone was activated on an iPhone 8 that did not belong to Plaintiff or anyone known to him.

34. AT&T's records showed that at 4:34 p.m. (MST) on November 9, 2022, the same SIM card showed up on a second iPhone 8 that is also unknown to Plaintiff.

35. AT&T's records revealed that on November 13, 2022, the same SIM card registered on Plaintiff's new telephone <u>for the first time</u>, despite having been purportedly assigned to Plaintiff's new telephone by AT&T on September 20, 2022, and despite Plaintiff paying for AT&T for services on the new telephone since then.

36. Thus, it was apparent that between September 20, 2022, when Plaintiff purchased the new telephone, and November 13, 2022, someone with access to AT&T's database withheld the SIM card and orchestrated the SIM swapping scheme.

37. The SIM Swap could not occur unless an AT&T employee negligently, wantonly, or intentionally caused Plaintiff's SIM card to be switched to the unauthorized telephones.

38. On March 13, 2024 – nearly a year and a half after the incident – AT&T finally notified Plaintiff that it had "determined that [Plaintiff's CPNI] was accessed without authorization" and that AT&T had then "taken appropriate action with regard to the individual whose credentials were used to access the account."

39. As a result of AT&T's failure to protect Plaintiff's data, Plaintiff lost the value of the cryptocurrency transferred from his cryptocurrency account, in the approximate amount of $303,000.

## COUNT I: Violation of the Federal Communications Act

40. Plaintiff incorporates all other paragraphs of this Complaint.

41. AT&T is a "telecommunications carrier" that qualifies as a "common carrier" within the meaning of the FCA. *See* 47 USC §§ 153(11), 153 (52).

42. Under the FCA, common carriers have "a duty to protect the confidentiality of proprietary information of, and relating to . . . customers . . ." *See* 47 U.S.C. § 222(a).

43. The FCA also prohibits AT&T from disclosing customer proprietary network information ("CPNI") unless certain exceptions apply. *See* 47 U.S.C. § 222(c). Specifically, Section 222(c) provides:

> Except as required by law or with the approval of a customer, a telecommunications carrier that receives or obtains [CPNI] by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to individually identifiable customer proprietary network information in its provision of (A) the telecommunications services from which such information is derived, or (B) services necessary to, or used in, the provision of such telecommunications services, including the publishing of directories.

47 U.S.C. § 222(c)(1).

44. CPNI includes the information contained on SIM cards. *See* 47 U.S.C. § 222(h).

45. Additionally, the FCC has adopted rules requiring telecommunications providers to safeguard CPNI. *See* 47 C.F.R. § 64.2001 et seq. ("CPNI Rules"); *see also*, 1998 CPNI Order, 13 FCC Rcd at 8195-200 ¶¶ 193-202.

46. The CPNI Rules limit use and disclosure of CPNI without customer approval to limited circumstances, none of which are applicable to AT&T's disclosure of Plaintiff's SIM card information to the hackers here. 47 C.F.R. § 64.2005.

47. The CPNI Rules also require carriers like AT&T to implement protocols to protect CPNI, including (i) training employees "as to when they are and are not authorized to use CPNI"; (ii) establishing "a supervisory review process regarding carrier compliance with the rules;" and (iii) filing annual compliance certificates with the FCC. *See* 47 C.F.R., §§ 64.2009(b), (d), and (e).

48. These rules require carriers like AT&T to implement measures to prevent disclosure of CPNI to unauthorized individuals. For example, carriers are required to implement measures to "properly authenticate a customer prior to disclosing CPNI based on customer-initiated telephone contact, online account access, or an in-store visit." *See* 47 C.F.R. § 64.2010(a).

49. The FCC has expressly ordered carriers to protect CPNI from access by impostors through social engineering tactics, like pretexting. *See* In the Matter of Implementation of the Telecommunications Act of 1996: Telecommunications Carriers' Use of Customer Proprietary Network Information and Other Customer Information, 22 FCC Rcd. 6927 (2007).

50. Despite its obligations under the FCA and FCC's regulations, and despite having actual knowledge hackers frequently target customers' CPNI through SIM Swapping, AT&T did not adopt adequate safeguards to prevent the SIM Swap targeting Plaintiff's data.

51. The information that AT&T disclosed to the hacker when they swapped Plaintiff's SIM card constituted CPNI and confidential proprietary information ("CPI") within the meaning of 47 U.S.C. § 222.

52. AT&T failed to protect the confidentiality of Plaintiff's CPI and CPNI, including Plaintiff's wireless telephone number, account information, and private communications. AT&T's disclosure of Plaintiff's CPI and CPNI enabled the hackers to execute the SIM Swap attack. Because of AT&T's unlawful disclosure of CPI and CPNI, AT&T permitted the hackers to intercept all authentication text messages and phone calls, which, foreseeably, allowed them to gain control of Plaintiff's cryptocurrency account and wallet.

53. When they fail to abide by their statutory obligations to protect CPNI, "common carrier[s] shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of [the FCA], together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case." 47 U.S.C. § 206.

54. As a result of AT&T's violation of the FCA and rules promulgated under it, Plaintiff has sustained and is entitled to recover from AT&T damages in the value of the stolen cryptocurrency, to be proven at trial, plus attorney fees and costs.

**COUNT II: NEGLIGENCE**

55. Plaintiff incorporates all other paragraphs of this Complaint.

56. AT&T owed Plaintiff a duty to exercise reasonable care in safeguarding his CPI, CPNI, and SIM card information, and to keep this information from being compromised, lost, stolen, misused, accessed, or disclosed to unauthorized parties. This duty included designing, maintaining, and testing its security systems to ensure that Plaintiff's information was adequately secured from unauthorized access and disclosure. AT&T also had a statutory duty to abide by the FCA, including Sections 206 and 222, and the regulations promulgated thereunder, including the CPNI Rules.

57. AT&T knew that its customers were targets of SIM Swaps and that it had been complicit in such attacks. For example, AT&T received the FBI's warning in early 2022, and AT&T was involved in litigation over its involvement in SIM Swaps long before Plaintiff's phone was targeted. *See, e.g.*, *Terpin v. AT&T Mobility, LLC*, Case No. 2:18-cv-06975-ODW (C.D. Cal. Aug. 15, 2018); *Williams v. AT&T Mobility, LLC*, Case No. 5:19-cv-475-BO (E.D. N.C. Oct. 24, 2019).

58. AT&T breached its duties to Plaintiff by failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's information.

59. Plaintiff's information, including his CPI and CPNI, would not have been compromised but for AT&T's breaches because SIM Swaps cannot occur absent the carrier's negligent, wanton, or intentional participation since only carriers can effectuate the swap.

60. AT&T's negligent, wanton, or intentional acts and omissions were the direct and legal cause of Plaintiff's injuries, including the loss of his cryptocurrencies, which were reasonably foreseeable. Plaintiff is entitled to recover the corresponding damages in an amount to be proven at trial.

## COUNT III: NEGLIGENT SUPERVISION AND TRAINING

61.     Plaintiff incorporates all other paragraphs of this Complaint.

62.     AT&T owed Plaintiff, its customer, a duty to exercise reasonable care in supervising and training its employees to safeguard and protect Plaintiff's information, including his CPI and CPNI, and to keep it from being used, accessed, or disclosed to unauthorized parties. This included training, instructing, and supervising employees to make sure they adhered to the security obligations set out in the FCA.

63.     AT&T was aware that its employees often bypassed security measures and actively participated in fraud involving customers, including pretexting and SIM Swap scams, because AT&T has been involved in multiple attacks like the one targeting Plaintiff.

64.     AT&T knew that Plaintiff's information, including his CPI, CPNI, and SIM card, was attractive to foreseeable bad actors.

65.     AT&T breached its duty to supervise and train its employees to safeguard Plaintiff's information by not requiring them to adhere to the requirements of the FCA and CPNI Rules.

66.     AT&T knew its supervision, training, and monitoring of its employees was inadequate because years prior to the attack targeting Plaintiff's SIM Card, AT&T had been sued for its employees' involvement in multiple SIM Swap attacks nearly identical to the one targeting Plaintiff.

67.     But for AT&T's breaches, Plaintiff would not have sustained any injuries because SIM Swaps require active participation from AT&T's personnel. AT&T's failure to supervise, train, and monitor its employees was the direct and legal cause of Plaintiff's losses.

68. It was reasonably foreseeable that AT&T's failure to train, supervise, and monitor its employees would result in Plaintiff's injuries because AT&T had plenty of notice that bad actors were targeting its customers' SIM cards.

69. As a result of AT&T's breaches, Plaintiff has sustained damages for the loss of his cryptocurrencies in an amount to be proven at trial.

## COUNT IV: NEGLIGENT HIRING

70. Plaintiff incorporates all other paragraphs of this Complaint.

71. AT&T owes its customers, including Plaintiff, a duty to hire competent, honest, and ethical employees who would safeguard and protect sensitive, confidential information, including Plaintiff's CPI and CPNI, from unauthorized use, access, and disclosure. AT&T also owes a duty to its customers, including Plaintiff, to exercise reasonable care in the operation of its stores, including the Store at issue here and any store operated by a third party.

72. AT&T knew that Plaintiff's CPI and CPNI, including his SIM card information, was confidential and sensitive, and that hackers were targeting this information.

73. On information and belief, AT&T breached its duty to hire employees who would safeguard and protect Plaintiff's CPI and CPNI, including his SIM card, because the attack could not have happened without the assistance of an AT&T employee.

74. AT&T knew that its hiring practices were inadequate because it had been involved in several attacks like the one targeting Plaintiff prior to the fall of 2022.

75. But for AT&T's negligent hiring practices, Plaintiff would not have sustained any injuries because the hackers could not have swapped his SIM card without assistance from an AT&T employee.

76. As a result of AT&T's negligent hiring practices, Plaintiff has suffered damages in an amount to be proven at trial, for the loss of his cryptocurrencies.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

## PRAYER FOR RELIEF

Plaintiff prays for relief against Defendants as follows:

1. For general damages against Defendants, and each of them, jointly and severally, in an amount to be determined at trial in order to restore Plaintiff to his position prior to AT&T's breaches, but in no event less than $303,000, or the present value of 76.46 Ethereum and .16858739 Bitcoin, whichever is greater;

2. For exemplary and punitive damages against Defendants, and each of them, in an amount to be determined at trial;

3. For reasonable attorney fees and costs pursuant to 47 U.S.C. § 206, Colorado law and, any applicable statute;

4. Pre- and post-judgment interest, as allowed by law; and

5. Such other relief as the Court deems just, equitable, and appropriate under the circumstances.

Dated: March 21, 2024.

HOLLAND & HART LLP

*/s/  Kevin C. McAdam*
Kevin C. McAdam
HOLLAND & HART LLP
555 17th Street, Suite 3200
Denver, CO  80202
Phone:  (303) 295-8000
Fax:  (303) 223-3293
kcmcadam@hollandhart.com

and

Engels J. Tejeda
HOLLAND & HART LLP
222 South Main Street, Suite 2200
Salt Lake City, Utah 84101
Phone:  (801) 799-5851
EJTejeda@HollandHart.com

*Counsel for Plaintiff Timothy Nichols*

31692561_v2

15