IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang

Civil Action No. 24-cv-00802-NYW-NRN

TIMOTHY NICHOLS,

    Plaintiff,

v.

AT&T MOBILITY, LLC,

    Defendant.

## ORDER

This matter is before the Court on Defendant AT&T Mobility LLC's Motion to Compel Arbitration and Request for Stay ("Motion to Compel Arbitration" or "Motion"), [Doc. 21, filed June 10, 2024].[1]  This Court concludes that oral argument would not materially assist in the resolution of this matter.  Upon careful review of the Motion, the docket, and applicable case law, the Court respectfully **GRANTS** the Motion to Compel Arbitration.

## BACKGROUND

This case arises from an in-store phone upgrade that Plaintiff Timothy Nichols ("Plaintiff" or "Mr. Nichols") initiated through his wireless telecommunications service provider, AT&T Mobility, LLC ("Defendant" or "AT&T"), in September 2022.  [Doc. 1 at ¶¶ 22–23, 26, 36].  Mr. Nichols alleges that, upon completion of the upgrade, he was forced to return to the store moments later because his upgraded phone would not place

---

[1] Where the court refers to the filings made in Electronic Case Files ("ECF") system in this action, it uses the convention [Doc. ___] and uses the page number as assigned by the ECF system.

outgoing calls.  [*Id.* at ¶¶ 24–25].  Back in the store, an AT&T employee took Mr. Nichols's new phone to a back room to "fix[]" an issue with the SIM card.  [*Id.* at ¶ 25].  A "subscriber identity module" or "SIM" card is a small, removable chip that allows a cellphone to communicate with the wireless carrier and identifies the subscriber associated with a particular cellphone.  [*Id.* at ¶ 14].  SIM cards also help customers retain their cellphone numbers and wireless service when they change mobile devices, because the customer's SIM card can be transferred to the new cellphone.  [*Id.* at ¶ 15].  Before a SIM card can be changed over to a customer's new device, the wireless carrier must effectuate the SIM card assignment.  [*Id.* at ¶ 16].  According to Mr. Nichols, his SIM card was not reassigned to his new phone and, instead, was "swapped" or cloned without his knowledge.  [*Id.* at ¶¶ 33, 51].

Mr. Nichols alleges that this "SIM swap" later allowed a third party to drain Mr. Nichols's cryptocurrency account.  [*Id.* at ¶¶ 27–28].  Mr. Nichols used his new phone to access his cryptocurrency account for the first time at approximately 9:00 AM on November 9, 2022.  [*Id.* at ¶ 27].  Later that day, an AT&T employee activated Mr. Nichols's SIM card on a stranger's telephone to facilitate a cryptocurrency exchange that emptied Mr. Nichols's cryptocurrency account.  [*Id.* at ¶¶ 33–36].  Ultimately, AT&T confirmed that it had "determined that [Mr. Nichols's] [confidential proprietary network information] was accessed without authorization" and AT&T had "taken appropriate action with regard to the individual whose credentials were used to access the account."  [*Id.* at ¶ 38].  Mr. Nichols claims that AT&T's refusal to help him recover his cryptocurrency or the value thereof has "forced him to seek redress in this Court."  [Doc. 32 at 6].

Plaintiff initiated this action by filing his Complaint on March 21, 2024, asserting four claims against Defendant for violation of the Federal Communications Act ("FCA"), negligence, negligent supervision and training, and negligent hiring.  [Doc. 1 at ¶¶ 40–76].[2]  AT&T filed the instant Motion to Compel Arbitration on June 10, 2024.  [Doc. 21].  In the Motion, AT&T seeks an order compelling Mr. Nichols to arbitrate his claims against it pursuant to an arbitration clause (the "Arbitration Agreement") contained in the AT&T Consumer Service Agreement ("CSA").  *See generally* [*id.*].  AT&T also asks the Court to stay this matter, pending completion of arbitration proceedings, pursuant to section 3 of the Federal Arbitration Act, 9 U.S.C. § 3 ("FAA").  [*Id.* at 13].

Mr. Nichols received several extensions to his deadline to respond to the Motion to Compel Arbitration.  [Doc. 23; Doc. 26].  On July 25, 2024, the Honorable N. Reid Neureiter held a Scheduling Conference in this matter and entered a minute order staying discovery pending determination of the instant Motion.  [Doc. 27].  Following a third extension of the deadline to respond to the Motion to Compel Arbitration, [Doc. 30], Mr. Nichols filed his response on September 20, 2024, [Doc. 32].  AT&T filed its reply on October 3, 2024.  [Doc. 33].  The Motion to Compel Arbitration is thus ripe for disposition.

## LEGAL STANDARD

The Federal Arbitration Act provides that agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Section 3 of the FAA obligates courts

---

[2] Plaintiff also asserted these same claims against former defendant AT&T Inc.  *See generally* [Doc. 1].  AT&T Inc. moved to dismiss Plaintiff's claims, [Doc. 20], and the Parties subsequently filed a self-effectuating stipulation of dismissal pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure, [Doc. 28; Doc. 31].  Plaintiff's claims against AT&T Inc. were dismissed with prejudice as of August 16, 2024.  *See* [Doc. 31].

to stay litigation on matters that the parties have agreed to arbitrate, while section 4 authorizes a federal district court to compel arbitration for a dispute over which it would have jurisdiction. *See* 9 U.S.C. §§ 3, 4. "By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

But because "arbitration is a matter of contract," the Court cannot require a party "to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (quotation omitted). "A court addressing a motion to compel arbitration . . . must first determine whether there exists an enforceable agreement to arbitrate." *Brayman v. KeyPoint Gov't Sols., Inc.*, 83 F.4th 823, 832 (10th Cir. 2023). Then, the court "determines such matters as . . . whether the agreement covers a particular controversy." *Id.* (cleaned up); *see also Cavlovic v. J.C. Penney Corp.*, 884 F.3d 1051, 1057 (10th Cir. 2018) (after first finding a valid agreement to arbitrate, the second step requires a court to determine whether the allegations in the complaint are within the scope of the arbitration provision). The party seeking to compel arbitration bears the burden of establishing that the matter at issue is subject to arbitration. *See Hancock v. Am. Tel. & Tel. Co., Inc.*, 701 F.3d 1248, 1261 (10th Cir. 2012).

## ANALYSIS

In support of its Motion to Compel Arbitration, AT&T argues that (1) the Arbitration Agreement constitutes a valid and enforceable arbitration agreement; (2) the CSA's broad arbitration clause is entitled to a presumption of arbitrability; and (3) each of Plaintiff's claims falls within the scope of the Arbitration Agreement. *See generally* [Doc. 21]. Mr. Nichols disagrees, arguing that his claims are beyond the scope of the Arbitration

4

Agreement, which he contends is unenforceable under the "effective vindication" doctrine. *See generally* [Doc. 32].

Courts must "first ask whether the parties agreed to submit their claims to arbitration," *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 90 (2000), and then "separately address[] the effective vindication exception," which "stands apart from the issue of whether the parties voluntarily agreed to submit their claims to arbitration," *Nesbitt v. FCNH, Inc.*, 811 F.3d 371, 378 (10th Cir. 2016). Accordingly, the Court first defines the Arbitration Agreement before turning to whether that agreement is valid under Colorado law. Then, the Court considers whether the instant dispute falls within the scope of the Arbitration Agreement. And finally, the Court considers whether the effective vindication doctrine renders the Arbitration Agreement unenforceable. For the reasons set forth below, the Court will compel arbitration of Mr. Nichols's claims.

## I.   Validity of the CSA Arbitration Agreement

The first step of the Court's arbitrability inquiry asks whether the Parties entered into a valid agreement to arbitrate. *Brayman*, 83 F.4th at 832. Whether a valid agreement to arbitrate exists "is simply a matter of contract between the parties." *Walker v. BuildDirect.com Techs., Inc.*, 733 F.3d 1001, 1004 (10th Cir. 2013) (quotation omitted). Accordingly, courts apply "ordinary state-law principles that govern the formation of contracts to determine whether a party has agreed to arbitrate a dispute." *Id.* (quotation omitted). The Parties agree that Colorado law applies here. *See* [Doc. 21 at 9; Doc. 32 at 7 & n.2 (citing § 1.12 of the CSA to support assertion that "Colorado law governs the [CSA]")]. "To be enforceable, a contract requires mutual assent to an exchange between competent parties for legal consideration." *French v. Centura Health Corp.*, 509 P.3d

5

443, 449 (Colo. 2022). "Under Colorado law, a contract requires a meeting of the minds." *Bellman v. i3Carbon, LLC*, 563 F. App'x 608, 613 (10th Cir. 2014) (quotation omitted). "The requisite meeting of the minds is established by the parties' acts, conduct, and words, along with the attendant circumstances, and not by any subjective, unexpressed intent by either party." *French*, 509 P.3d at 449.

There is no dispute that as part of the September 2022 in-store transaction to upgrade his phone, Mr. Nichols accepted and signed AT&T's CSA. [Doc. 21-3; Doc. 21-4; Doc. 32]. Defendant requests that this Court compel arbitration of Plaintiff's claims based on the Arbitration Agreement contained in § 1.3.2 of the CSA, which provides in relevant part:

> **1.3.2.1 Claims Subject to Arbitration:**
>
> To the greatest extent permitted by law, AT&T and you agree to arbitrate all disputes and claims between you and AT&T, except for claims arising from bodily injury or death. This arbitration provision is intended to be broadly interpreted. It includes, but is not limited to . . . claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, fraud, misrepresentation, or any other statutory or common-law legal theory[.]

[Doc. 21-3 at 3 § 1.3.2.1]; *but see* [Doc. 21-1 at ¶ 6].[3]

---

[3] Defendant cites the following language, which appears only in the Declaration of John Fuller (and nowhere in the CSA):

> In the unlikely event that AT&T's customer service department is unable to resolve a complaint you may have to your satisfaction (or if AT&T has not been able to resolve a dispute it has with you after attempting to do so informally), we each agree to resolve those disputes through binding arbitration or small claims court instead of in courts of general jurisdiction.
>
> AT&T and you agree to arbitrate all disputes and claims between us, [including] claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory.

6

As the Party opposing arbitration, Mr. Nichols bears the burden of establishing that the CSA is unconscionable.  *See Weller v. HSBC Mortg. Servs., Inc.*, 971 F. Supp. 2d 1072, 1080 (D. Colo. 2013).  Mr. Nichols makes only a perfunctory argument that the instant Motion fails at step one of the arbitrability inquiry because "this case is unconscionable to the extent it applies to unforeseen conduct like theft of Nichols' information and cryptocurrency by an AT&T employee," apparently because "resolution of the second question is dispositive."  [Doc. 32 at 8 & n.3].  Specifically, Mr. Nichols invokes an unconscionability defense to invalidate the Arbitration Agreement in a single sentence in a footnote, unaccompanied by any supporting legal authority.  *See* [*id.* at 8 n.3].  However, "[a]rguments raised in a perfunctory manner, such as in a footnote, are waived," *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) (en banc); *see also Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1249 (10th Cir. 2015) (observing that a court may decline to consider argument which is unsupported and inadequately briefed), and Mr. Nichols does not otherwise dispute the validity of the CSA or its Arbitration Agreement, *see generally* [Doc. 32].

Accordingly, the Court finds that Mr. Nichols has failed to carry his burden and concludes that the Parties entered into a valid agreement to arbitrate all disputes and claims arising out of or relating to any aspect of the Parties' relationship.  [Doc. 21-3 at 3 § 1.3.2.1].

---

[Doc. 21 at 7]; *compare* [*id.*], *and* [Doc. 21-1 at ¶ 6], *with* [Doc. 21-3 at 3–5 § 1.3.2]. Nevertheless, both Parties cite the Arbitration Agreement contained in the CSA, *see, e.g.*, [Doc. 21 at 7, 9, 11–12; Doc. 32 at 11–12; Doc. 33 at 4–7], the core of which is congruent with the language misquoted by Defendant.  The Court finds it appropriate to apply the Parties' arguments to the actual text of the CSA.

7

II.     **Plaintiff's Claims Fall Within the Scope of the Arbitration Agreement**

Next, the Court must determine whether Plaintiff's claims fall within the scope of the Arbitration Agreement. "The factual allegations which form the basis of the claim asserted, rather than the legal cause of action pled," determine "whether a particular dispute falls within the reach of the [arbitration] clause." *City & Cnty. of Denver v. Dist. Ct.*, 939 P.2d 1353, 1364 (Colo. 1997). The Arbitration Agreement broadly covers "all disputes and claims between [the Parties], except for claims arising from bodily injury or death," and specifically provides that it is "intended to be broadly interpreted." [Doc. 21-3 at 3 § 1.2.3.1]. Thus, the "presumption of arbitrability" is "particularly applicable" to the Arbitration Agreement. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986); *see also ARW Expl. Corp. v. Aguirre*, 45 F.3d 1455, 1462 (10th Cir. 1995). Through this lens, the Court considers whether Mr. Nichols's statutory and tort-based claims fall within the scope of the Arbitration Agreement.

To support the argument that the Arbitration Agreement's "broad language does not apply to the claims for AT&T's active participation in theft of [his] property," [Doc. 32 at 8–9], Mr. Nichols cites *Vaughn v. JP Morgan Chase & Co.*, 707 F. Supp. 3d 1042, 1046–47 (D. Colo. 2023), and *Chun Choe v. T-Mobile USA, Inc.*, No. 18-cv-00648-DOC-KESx, 2018 WL 6131574 (C.D. Cal. Aug. 1, 2018). However, this Court respectfully notes that *Vaughn* and *Choe* are not binding on this Court, *see Camreta v. Greene*, 563 U.S. 692, 714 n.7, (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." (quotation omitted)), and concludes that they are not persuasive because they are not factually analogous to this case.

**Vaughn**.  In *Vaughn*, the defendant bank ("Chase") sought to compel arbitration of the plaintiff's claims for racial discrimination, defamation, and negligent infliction of emotional distress stemming from an encounter between the plaintiff (a Chase customer) and an employee in the bank's lobby.  *Vaughn*, 707 F. Supp. 3d at 1045.  The arbitration provision in the plaintiff's bank account agreement with Chase identified the following as subject to arbitration:  (1) claims or disputes about the plaintiff's account or transactions involving the same, her safe deposit box, and "any related services" with Chase; and (2) claims or disputes "arising from or relating to" the plaintiff's bank account agreement, her application, and/or Chase's approval or establishment of the plaintiff's bank account.  *Id.* at 1046–47.

The *Vaughn* court rejected Chase's argument that the dispute was "arising from or relating to" the plaintiff's bank account agreement with Chase; the fact that the plaintiff had an account with Chase was "irrelevant" because she "was not allowed to even attempt a bank transaction before she was approached and accused of nefarious conduct."  *Id.* at 1052.  Because the plaintiff alleged that Chase had treated her like she "was *not* a customer and had *no* relationship with Chase," the court found that the plaintiff's claims "would exist outside any contractual relationship with Chase and therefore do not necessarily arise from or relate to the [bank account agreement]."  *Id*. at 1053.  The court further found that limiting language indicating that disputes *about Plaintiff's deposit account* were subject to arbitration reinforced the conclusion that the plaintiff's claims of racial discrimination were "wholly independent from her account" and thus, were not within the scope of the arbitration provision. *Id.* at 1053–54.

9

**Choe**.  *Choe* involved "outrageous" allegations of "criminal hacking" and "larceny" by the plaintiff's girlfriend and her friend, a T-Mobile employee, who worked in concert to hack the plaintiff's cellphone to confirm his infidelity.  2018 WL 6131574, at *2.  The arbitration clause contained in T-Mobile's wireless service agreement provided that "any and all claims or disputes in any way related to or concerning the agreement, [T-Mobile's] privacy policy, [T-Mobile's] services, devices or products, including any billing disputes, will be resolved by binding arbitration[.]"  *Id.* at *3 (capitalization altered).  Recognizing that T-Mobile consumers were thereby bound to arbitrate claims "related to [the] business of providing cell phone services," the court compelled the arbitration of the plaintiff's claims relating to "unauthorized misuse of customer information" and "breach of [T-Mobile's] safeguards."  *Id*. at *5–7.  The court found that the plaintiff's employee fraud and criminal larceny claims were not covered by the arbitration clause in part because T-Mobile did not state that the parties had agreed to arbitrate tort and criminal actions of T-Mobile employees.  *Id.* at *6.  The court also denied T-Mobile's motion to compel arbitration of the plaintiff's negligence claims because T-Mobile had failed to specifically address whether the arbitration clause applied to the negligence claims.  *See id.* at *7.

Here, the Arbitration Agreement contains much broader language than the clauses at issue in *Vaughn* and *Choe*.  Most notably, the Arbitration Agreement does not contain limiting language (unlike the clause in *Vaughn*), but instead, it broadly provides for arbitration for "any and all disputes between you and AT&T, except for claims arising for bodily injury and death" and expressly includes tort and common-law claims among the types of disputes subject to arbitration (unlike the clause in *Choe*).  *Cf. Sanchez v. Nitro-Lift Techs., L.L.C.*, 762 F.3d 1139, 1146–47 (10th Cir. 2014) (explaining that "limiting

10

language" can include "restricting arbitration to any specific disputes or to the agreement itself").

Moreover, despite Mr. Nichols's argument to the contrary, [Doc. 32 at 14 n.4], the factual allegations in the Complaint show that Mr. Nichols's claims directly relate to his AT&T wireless services. For example, Mr. Nichols's FCA claim is premised on AT&T's failure to protect the confidentiality of his "confidential proprietary information" ("CPI") and "customer proprietary network information" ("CPNI"). [Doc. 1 at ¶¶ 42, 52]. Similarly, AT&T's failure to protect Plaintiff's "CPI and CPNI" is also central to each of his negligence claims. Mr. Nichols defines both terms by reference to § 222 the FCA. *See, e.g.*, [*id.* at ¶¶ 43, 51]. According to the Complaint, § 222 applies to AT&T because it received or obtained Plaintiff's CPNI "*by virtue of its provision of a telecommunications service.*" [*Id.* at ¶ 43 (quoting 47 U.S.C. § 222(c)) (emphasis added)]. The Complaint alleges that, "*despite Plaintiff paying . . . AT&T for services* on the new telephone since [September 20, 2022]," his SIM card did not register on his new phone until November 13, 2022, because of a SIM-swapping scheme "orchestrated" by an AT&T employee and executed via AT&T's "database." [*Id.* at ¶¶ 35–36 (emphasis added)]. Moreover, the duties underlying Mr. Nichols's negligence claims expressly arise out of the relationship between a wireless carrier (AT&T) and its customer (Mr. Nichols). *See, e.g.*, [*id.* at ¶ 56 (alleging breach of AT&T's "duty to exercise reasonable care in safeguarding [Plaintiff's] CPI, CPNI, and SIM card information . . . ."); *id.* at ¶ 62 ("AT&T owed Plaintiff, its customer, a duty to exercise reasonable care in supervising and training its employees to safeguard and protect Plaintiff's . . . CPI and CPNI . . . ."); *id.* at ¶ 71 ("AT&T owes its customers, including Plaintiff, a duty to hire . . . employees who would safeguard and protect . . .

11

Plaintiff's CPI and CPNI. . . . AT&T also owes a duty to its customers . . . to exercise reasonable care in the operation of its stores, including the Store at issue here.")].

Thus, the Court finds that Mr. Nichols's FCA and negligence claims are "claims arising out of or relating to any aspect of the relationship between" the Parties, and "based in . . . tort" or "statutory or common-law legal theory."[4]   [Doc. 21-3 at 3 § 1.3.2.1]. Accordingly, Mr. Nichols's claims fall within the scope of the Arbitration Agreement.

### III.   Application of the Effective Vindication Doctrine

Having concluded that the dispute is within the scope of the CSA's Arbitration Agreement, the Court next considers whether the Arbitration Agreement fails to the extent that AT&T seeks to enforce the CSA's fee-shifting and limitation of liability clauses.  *See Rains v. Found. Health Sys. Life & Health*, 23 P.3d 1249, 1253 (Colo. App. 2001).  Mr. Nichols invokes the "effective vindication" doctrine, arguing that "the [CSA's] limitation of liability and fee shifting clauses render the Arbitration Clause unenforceable" because "their enforcement would prevent [him] from receiving or even seeking the redress provided by the FCA." [Doc. 32 at 14–16].  Specifically, Mr. Nichols challenges the CSA provision that "AT&T will pay all AAA filing, administration, case management, hearing,

---

[4] Though not raised by the Parties, this Court takes judicial notice of the dockets for the cases cited by Plaintiff in his Complaint as evidencing "repeated lawsuits arising from almost identical fact patterns." [Doc. 1 at 1–2]. *See Bunn v. Perdue*, 966 F.3d 1094, 1096 n.4 (10th Cir. 2020) (recognizing that a court may take judicial notice of docket information from another court).  None of those courts reached the question of whether the plaintiff's claims against AT&T Mobility were subject to arbitration. *See Williams v. AT&T Mobility, LLC*, No. 5:19-cv-00475-BO, 2020 WL 1492803 (E.D.N.C. Mar. 25, 2020) (denying motion to dismiss for failure to state a claim); *Ross v. AT&T Mobility, LLC*, No. 4:19-cv-06669-JST, 2020 WL 9848766 (N.D. Cal. May 14, 2020) (granting in part and denying in part motion to dismiss for failure to state a claim); *Edwards v. AT&T*, No. 21-cv-00342-BSJ (D. Utah June 3, 2021), ECF No. 43 (motion to compel arbitration), ECF No. 55 (dismissed with prejudice pursuant to Rule 41(a)(1)(A)(ii) while motion to compel arbitration was pending).

12

and arbitrator fees *only if* either AT&T initiates arbitration *or* the amount claimed is less than $75,000.00." [*Id.* at 16 (citing [Doc. 21-3 at 4 § 1.3.2.4]) (quotation omitted)]. Plaintiff further contends that the limitation of liability clause of the CSA effectively prevents his right to recover under the FCA. [*Id.* at 16–17].

### A. Effective Vindication Doctrine

The effective-vindication doctrine is a judicially created exception to the FAA borne from the need to harmonize the FAA's policy favoring arbitration with other federal statutory rights. *Green Tree,* 531 U.S. 79; *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 235–36 (2013). The doctrine exists to "prevent prospective waiver of a party's *right to pursue* statutory remedies." *Italian Colors*, 570 U.S. at 236. Federal courts may enforce an arbitration agreement only "so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum." *Id.* at 235 (quotation omitted). Notwithstanding the FAA's presumption in favor of arbitrability, "this presumption falters 'if the terms of an arbitration agreement actually prevent an individual from effectively vindicating his or her statutory rights.'" *Nesbitt*, 811 F.3d at 377 (quoting *Shankle v. B-G Maint. Mgmt. of Colo., Inc.*, 163 F.3d 1230, 1234 (10th Cir. 1999)). Relevant here, the effective vindication doctrine ostensibly "cover[s] filing and administrative fees attached to arbitration that are so high as to make access to the forum impracticable." *Italian Colors*, 570 U.S. at 236.

### B. Application

AT&T responds to Mr. Nichols's effective vindication defense with two arguments. [Doc. 33 at 6–7]. First, with respect to fee-shifting, Defendant argues that the only case on which Mr. Nichols relies, *Anderson v. Regis Corp.*, No. 05-cv-00646-TCK-SAJ, 2006

13

WL 8457208 (N.D. Okla. Apr. 26, 2006), is non-binding and factually distinguishable. [Doc. 33 at 6]. Second, AT&T argues that whether the limitation of liability clause applies to some or all of Mr. Nichols's claims is not properly before this Court in deciding the issue of arbitrability. [*Id.* at 6–7]. The Court considers each of the foregoing arguments, in turn.

### 1.     Fee Shifting

Mr. Nichols relies exclusively on an unpublished, out-of-district decision—in lieu of any binding authority on the effective vindication doctrine—to argue that "plaintiffs like [him] should not be forced to pay for the opportunity to have their federal statutory claims heard." [Doc. 32 at 17 (citing *Anderson*, 2006 WL 8457208)]. AT&T responds that Plaintiff's reliance on *Anderson* is misplaced both because *Anderson* is not binding and because it is factually distinguishable. The Court respectfully agrees with AT&T.

In *Anderson*, the Northern District of Oklahoma looked to the decision in *Green Tree*, where the Supreme Court recognized the possibility that "large arbitration costs could preclude a litigant . . . from effectively vindicating her federal statutory rights in the arbitral forum." *Green Tree*, 531 U.S. at 90. However, the Supreme Court also "emphasized that the party 'seeking to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive bears the burden of showing the likelihood of incurring such costs.'" *Nesbitt*, 811 F.3d at 377–78 (quoting *Green Tree*, 531 U.S. at 92 (cleaned up)). Because the record in *Green Tree* "reveal[ed] only the arbitration agreement's silence on the subject [of arbitration fees and costs]," it was "plainly insufficient" to satisfy the plaintiff's burden. 531 U.S. at 91.

The arbitration agreement in *Anderson* was "not silent but instead expressly require[d] the splitting of fees," notwithstanding an "'unless' clause'" that allowed the

14

employee "to show the arbitrator that fee-splitting would result in incurring prohibitive costs," which failed to "alleviate the problems presented by fee-splitting provisions." 2006 WL 8457208, at *4–5.  The court concluded that, under *Green Tree*, the appropriate inquiry before finding the fee-splitting provision unenforceable was "whether [the] [p]laintiff has in fact made a showing that the costs will be prohibitive." *Id.* at *5.  Among other things, the plaintiff submitted an affidavit establishing her monthly earnings and averred that she was the caretaker for five dependents, spent all her earnings on household expenses, and was unlikely to be able to pursue her claims in arbitration due to the costs. *Id.*  Based on the record, the court found that the plaintiff "made a showing that splitting fees for the arbitration would be cost prohibitive and that the fee-splitting provision [was] unenforceable as applied to [the p]laintiff's financial circumstances."  *Id.*

Here, while the CSA's Arbitration Agreement is not silent as to costs, it specifies only that (1) AT&T "will pay all AAA filing, administration, case-management, hearing, and arbitrator fees" if (a) AT&T initiates arbitration, or (b) the amount in dispute is less than $75,000; and (2) "the allocation and payment of all such fees will be governed by AAA Rules" if the arbitrator finds that the plaintiff's claim is frivolous or brought for an improper purpose.  [Doc. 21-3 at 4 § 1.3.2.4].  The Arbitration Agreement is otherwise silent with respect to the apportionment of fees between the Parties.[5]  *See* [*id.*].  There is no attorney's fees shifting provision within the Arbitration Agreement.[6]  *See* [*id.*]. Furthermore, even if Mr. Nichols is likely to incur at least some costs (e.g., filing fees), he

---

[5] To the extent that AT&T prevails on this instant Motion to Compel Arbitration, AT&T arguably would be deemed the party initiating the arbitration and thus, responsible for filing, administration, case-management, hearing, and arbitrator fees.

[6] In other sections of the CSA, AT&T does expressly provide for attorney's fees.  *See* [Doc. 21-3 at 23–24 § 4.2.4].

has submitted nothing from which the Court could conclude that the costs are likely to personally burden his financial ability to pursue his FCA claim. This is "plainly insufficient" to satisfy Plaintiff's burden. See *Green Tree*, 531 U.S. at 92.

### 2. Limitation of Liability

With respect to Mr. Nichols's limitation of liability clause arguments, AT&T counters that whether the limitation of liability clause applies to some or all of Mr. Nichols's claims is not properly before this Court in deciding the issue of arbitrability. [Doc. 33 at 6]. The Court respectfully agrees with AT&T and finds that application of the CSA's limitation of liability clause goes to the merits—and not the arbitrability—of Mr. Nichols's claims. *Cf. Jefferson Cnty. Sch. Dist. No. R-1 v. Shorey*, 826 P.2d 830, 840 (Colo. 1992) ("[A] court, in deciding the issue of arbitrability, should not rule on the merits of the underlying claim but, rather, should relegate that issue, in accordance with the intent of the parties, to the arbitrator."). The Court also finds *Anderson* inapposite.

The agreement in *Anderson* was a standalone arbitration agreement, and "[t]he sole function" of the arbitration agreement "relate[d] to arbitration of claims." 2006 WL 8457208, at *3 n.2. Indeed, the court expressly noted that the "[p]laintiff's attack on enforceability in [*Anderson*] relate[d] solely to the agreement to arbitrate and not to the validity of an underlying agreement that include[d] an arbitration provision." *Id.* (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967)). And the limitation of remedies clause at issue in *Anderson* expressly applied only to "any arbitration award," *id.* at *5, whereas the limitation of liability clause here applies to the entire CSA—i.e., the "underlying agreement that includes an arbitration provision," *id.* at 3 n.2—and contains no distinction between judicial and arbitral awards. Indeed, the

16

Arbitration Agreement expressly provides that, except in certain respects applicable to class actions, "the arbitrator can award the same damages and relief that a court can award under applicable law." [Doc. 21-3 at 4 § 1.3.2.3]; *see also* [*id.* at 3 § 1.3.1 (explaining in "Summary" of "Dispute Resolution" section of CSA that an "arbitrator applies the same law and can award the same individualized remedies that a court could award")].[7]

To the extent Mr. Nichols claims that the CSA's limitation of liability provision renders the CSA unenforceable because it "undermine[s] the remedial nature of the FCA by limiting through contract the damages [he] is entitled to recover," [Doc. 32 at 17], the Court notes that the limitation of liability provision applies even if Mr. Nichols's claims are adjudicated in a judicial forum, *see* [Doc. 21-3 at 7 § 1.7]. Thus, "the same issues of enforceability can be presented regardless of where the disputes are heard." *Axis Venture Grp., LLC v. 1111 Tower, LLC*, No. 09-cv-01636-PAB-KMT, 2010 WL 1278306, at *9 (D. Colo. Mar. 30, 2010). And an abstract and speculative risk that damages may be limited at the end of the adjudicative process is not a question properly before this Court in determining the arbitrability of the Parties' dispute. *See id.*; *cf. Green Tree*, 531 U.S. at 90. Instead, whether the limitation of liability clause is enforceable against and applicable to some or all of Mr. Nichols's claims "is a matter for the arbitrator to address."

---

[7] Section 1.3 of the CSA governs "Dispute Resolution." [Doc. 21-3 at 3 § 1.3]. Subsections 1.3.1 and 1.3.2 set forth a "Summary" and the "Arbitration Agreement," respectively. [*Id.*]. The Arbitration Agreement contains nine subparts. *See, e.g.*, [*id.* at 3–5 §§ 1.3.2.1 through 1.3.2.9]. The limitation of liability clause is not contained in the Arbitration Agreement or Section 1.3. Instead, it is a discrete section of the CSA. [*Id.* at 7 § 1.7 (Limitation of Liability)].

*Vernon v. Qwest Commc'ns Int'l, Inc.*, 925 F. Supp. 2d 1185, 1195 (D. Colo. 2013); *see also PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 405–07 (2003).

Because this dispute falls within the scope of the Arbitration Agreement, and because Mr. Nichols has not met his burden to overcome the presumption of arbitrability, Mr. Nichols must assert his claims against AT&T in an arbitral forum. Accordingly, the Motion to Compel Arbitration is respectfully **GRANTED**.

## IV.   Administrative Closure

Section 3 of the FAA obligates courts to stay litigation on matters that the parties have agreed to arbitrate. 9 U.S.C. § 3; *cf. Smith v. Spizzirri*, 601 U.S. 472, 475–76 (2024) (no discretion "[w]hen a federal court finds that a dispute is subject to arbitration[] and a party has requested a stay of the court proceeding pending arbitration"). Each of Mr. Nichols's claims against A&T are arbitrable and AT&T requests a stay pending the completion of arbitration proceedings. Thus, pursuant to § 3 of the FAA, the Court must stay this action pending arbitration. 9 U.S.C. § 3; *Smith*, 601 U.S. at 476.

However, the Court finds that administrative closure under D.C.COLO.LCivR 41.2—rather than an indefinite stay of the proceedings—is more appropriate here. *See Talmadge v. Berkley Nat'l Ins. Co.*, 687 F. Supp. 3d 1089, 1094 (D. Colo. 2023) ("Administrative closure pursuant to D.C.COLO.LCivR 41.2 may be appropriate when a case would otherwise be stayed for an indefinite amount of time."); D.C.COLO.LCivR 41.2 ("A district judge . . . may order the clerk to close a civil action administratively subject to reopening for good cause."); *Angermann v. Gen. Steel Domestic Sales, LLC*, No. 10-cv-00711-REB-MJW, 2010 WL 4628913, at *2 (D. Colo. Nov. 8, 2010) (administratively closing the case subject to reopening after finding that a stay was required under § 3 of

the FAA); *see also Quinn v. CGR*, 828 F.2d 1463, 1465 n.2 (10th Cir. 1987) (noting that administrative closure is construed as "the practical equivalent of a stay"). Accordingly, the Court will order that this matter be administratively closed, subject to reopening for good cause.[8]

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)  Defendant AT&T Mobility LLC's Motion to Compel Arbitration and Request for Stay [Doc. 21] is **GRANTED**;

(2)  The Clerk of Court is **DIRECTED** to **ADMINISTRATIVELY CLOSE** this action pending resolution of arbitration proceedings, subject to reopening for good cause;

(3)  Within **10 days** after the completion of the arbitration, the Parties shall jointly **FILE** a status report describing the results of the arbitration and indicating what, if any, further action each Party intends to take in this case; and

(4)  Should no motion to reopen or status report be filed by **December 31, 2025**, the Court will **TERMINATE** this action with no further notice by the Court.

DATED: February 10, 2025                BY THE COURT:

                                        _____
                                        Nina Y. Wang
                                        United States District Judge

---

[8] "[G]ood cause to reopen a case exists where the parties wish to litigate the remaining issues that have become ripe for review." *Patterson v. Santini*, 631 F. App'x 531, 534 (10th Cir. 2015) (quotation omitted).